1   Benjamin Heikali (SBN 307466)
    **FARUQI & FARUQI, LLP**
2   10866 Wilshire Boulevard, Suite 1470
    Los Angeles, CA 90024
3   Telephone: (424) 256-2884
    Facsimile: (424) 256-2885
4   E-mail:  bheikali@faruqilaw.com

5   [Additional Captions on Signature Page]

6   *Attorney for Plaintiff Michelle Stevens*

7

8                    **UNITED STATES DISTRICT COURT**
                **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
9

10  MICHELLE STEVENS, Individually and
    on Behalf of All Others Similarly Situated,
11
                        Plaintiff,
12
                                            Case No. 3:19-cv-01414
13          v.
                                            **CLASS ACTION COMPLAINT FOR**
14  ELLIE MAE, INC., SIGMUND                **VIOLATIONS OF SECTIONS 14(a) AND**
    ANDERMAN, JONATHAN H. CORR,             **20(a) OF THE SECURITIES**
15  KAREN BLASING, CARL                     **EXCHANGE ACT OF 1934**
    BUCCELLATO, CRAIG DAVIS, A.
16  BARR DOLAN, ROBERT J. LEVIN,            **JURY TRIAL DEMANDED**
    MARINA LEVINSON, JEB S. SPENCER,
17  and RAJAT TANEJA,

18
                        Defendants.
19

20

21

22

23

24

25

26

27

28  **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF**
    **THE SECURITIES EXCHANGE ACT OF 1934**
                                                            3:19-cv-01414

Plaintiff Michelle Stevens ("Plaintiff"), by her undersigned attorneys, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This action is brought as a class action by Plaintiff on behalf of herself and the other public holders of the common stock of Ellie Mae, Inc. ("Ellie Mae" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Ellie Mae, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed acquisition (the "Proposed Transaction") of Ellie Mae by Thoma Bravo LLC ("Thoma Bravo").

2. On February 28, 2019, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which Ellie Mae stockholders will receive $99.00 in cash for each share of Ellie Mae common stock they hold (the "Merger Consideration").

3. On March 15, 2019, in order to convince Ellie Mae shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Proxy Statement on Schedule 14A (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4. While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose certain material information that is necessary for stockholders to properly assess the fairness of the Proposed Transaction, thereby rendering certain statements in the Proxy false and/or misleading.

5. In particular, the Proxy contains materially incomplete and misleading information concerning Ellie Mae's financial projections, which were developed by the Company's management and relied on by the Board to recommend the Proposed Transaction.

1

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

6.     It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote, so that they can properly exercise their corporate suffrage rights.

7.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for contraventions of: (i) Rule 14a-9; and (ii) Regulation G, 17 C.F.R. § 244.100, in violation of Sections 14(a) and 20(a) of the Exchange Act.  Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Ellie Mae stockholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Ellie Mae is headquartered in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, an Ellie Mae shareholder.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

3:19-cv-01414

12.     Defendant Ellie Mae is a Delaware corporation and maintains its principal executive offices at 4420 Rosewood Drive, Suite 500, Pleasanton, CA 94588.  Ellie Mae's common stock is traded on the New York Stock Exchange under the ticker symbol "ELLI."

13.     Individual Defendant Sigmund Anderman founded the Company and has served as Ellie Mae's Executive Chairman since February 2015.

14.     Individual Defendant Jonathan H. Corr has served as Chief Executive Officer of the Company since February 2015 and as a director of the Company since 2015.

15.     Individual Defendant Karen Blasing has served as a director of the Company since June 2015.

16.     Individual Defendant Carl Buccellato has served as a director of the Company since December 1997.

17.     Individual Defendant Craig Davis has served as a director of the Company since January 2004.

18.     Individual Defendant A. Barr Dolan has served as a director of the Company since June 2005.

19.     Individual Defendant Robert J. Levin has served as a director of the Company since June 2009.

20.     Individual Defendant Marina Levinson has served as a director of the Company since August 2014.

21.     Individual Defendant Jeb S. Spencer has served as a director of the Company since August 2011.

22.     Individual Defendant Rajat Taneja has served as a director of the Company since June 2015.

23.     The Individual Defendants and Ellie Mae may collectively be referred to as "Defendants."  Each of the Individual Defendants herein is sued individually as well as in his or her capacity as an officer and/or trustee of the Company, and the liability of each arises from the

3

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1    fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions

2    complained of herein.

3                                **CLASS ACTION ALLEGATIONS**

4            24.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of herself

5    and the other public shareholders of Ellie Mae (the "Class").   Excluded from the Class are

6    Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated

7    with any Defendant.

8            25.    This action is properly maintainable as a class action because:

9            a.    The Class is so numerous that joinder of all members is impracticable.

10    According to the Proxy, as of March 14, 2019, there were approximately 35,044,413 shares

11    of Ellie Mae common stock outstanding, held by hundreds to thousands of individuals and

12    entities throughout the country.   The actual number of public shareholders of Ellie Mae

13    will be ascertained through discovery;

14            b.    There are questions of law and fact that are common to the Class that

15    predominate over any questions affecting only individual members, including the

16    following:

17                    i)    whether Defendants disclosed material information that includes

18                          non-GAAP financial measures without a presentation and

19                          reconciliation of those measures to their most directly comparable

20                          GAAP equivalent in violation of Section 14(a) of the Exchange Act;

21                    ii)   whether the omission of the GAAP financial measures violates

22                          Section 14(a) of the Exchange Act;

23                    iii)  whether the Individual Defendants have violated Section 20(a) of

24                          the Exchange Act; and

25                    iv)   whether Plaintiff and other members of the Class will suffer

26                          irreparable harm if compelled to vote their shares regarding the

27                                        4

28    **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF**
      **THE SECURITIES EXCHANGE ACT OF 1934**

1    Proposed Transaction based on the materially incomplete and

2    misleading statements in the Proxy.

3    c.    Plaintiff is an adequate representative of the Class, has retained competent

4    counsel experienced in litigation of this nature, and will fairly and adequately protect the

5    interests of the Class;

6    d.    Plaintiff's claims are typical of the claims of the other members of the Class

7    and Plaintiff does not have any interests adverse to the Class;

8    e.    The prosecution of separate actions by individual members of the Class

9    would create a risk of inconsistent or varying adjudications with respect to individual

10    members of the Class, which would establish incompatible standards of conduct for the

11    party opposing the Class;

12    f.    Defendants have acted on grounds generally applicable to the Class with

13    respect to the matters complained of herein, thereby making appropriate the relief sought

14    herein with respect to the Class as a whole; and

15    g.    A class action is superior to other available methods for fairly and

16    efficiently adjudicating the controversy.

17    <u>**SUBSTANTIVE ALLEGATIONS**</u>

18    26.    Ellie Mae is a cloud-based platform provider for the mortgage finance industry.

19    27.    On February 12, 2019, Ellie Mae announced the Proposed Transaction in a press

20    release which states, in pertinent part:

21

22    **Ellie Mae Stockholders to Receive $99.00 Per Share in Cash; Ellie**
       **Mae to Continue Driving Mortgage Finance Innovations as a**
23    **Privately Held Company**

24    PLEASANTON, Calif. – Feb. 12, 2019 – Ellie Mae® (NYSE:ELLI), the
       leading cloud-based platform provider for the mortgage finance industry,
25    announced that it has entered into a definitive agreement to be acquired by
       Thoma Bravo, LLC, a leading private equity investment firm, in an all-
26

27    5

28    **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF**
       **THE SECURITIES EXCHANGE ACT OF 1934**

cash transaction that values Ellie Mae at an aggregate equity value of approximately $3.7 billion.

Under the terms of the agreement, all Ellie Mae shareholders will receive $99.00 in cash per share. The price per share represents a 47 percent premium to the 30-day average closing share price and 49 percent premium to the 60-day average closing price as of February 1, 2019.

"Since the founding of Ellie Mae more than 20 years ago, our mission has been simple – to automate everything automatable for the residential mortgage industry," said Jonathan Corr, president and CEO of Ellie Mae. "As we enter this next phase of our digital mortgage journey, we are thrilled to provide immediate value to our shareholders. With the investment and support from Thoma Bravo, we will remain committed to our customers' success, innovation and growth of the Encompass Digital Lending Platform while maintaining our position as a best place to work."

"Ellie Mae delivers powerful and innovative mortgage technology solutions across every channel of the residential mortgage sector, enabling lenders to originate more loans while reducing costs and driving efficiency, quality and compliance throughout the mortgage process," said Holden Spaht, a Managing Partner at Thoma Bravo. "Ellie Mae is leading the digital transformation of the residential mortgage industry and we look forward to building on the company's successes and to our partnership through this next chapter of growth."

Ellie Mae's Board of Directors unanimously approved the definitive agreement and recommended that stockholders vote their shares in favor of the transaction. Ellie Mae's headquarters will remain in Pleasanton, California, with regional offices across the United States. Closing of the transaction is subject to approval by Ellie Mae stockholders and regulatory authorities and the satisfaction of customary closing conditions. The transaction is expected to close in the second or third quarter of 2019 and is not subject to a financial condition.

The agreement includes a 35 day "go-shop" period, which permits Ellie Mae's Board and advisors to actively initiate, solicit, encourage, and potentially enter negotiations with parties that make alternative acquisition proposals. Ellie Mae will have the right to terminate the merger agreement to enter into a superior proposal subject to the terms and conditions of the merger agreement. There can be no assurance that this 35 day "go-shop" will result in a superior proposal, and Ellie Mae does not intend to disclose developments with respect to the solicitation process unless and until the Board makes a determination requiring further disclosure.

6
**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

J.P. Morgan Securities LLC is serving as the exclusive financial advisor to Ellie Mae and Cooley LLP is serving as the legal advisor to Ellie Mae. Jefferies LLC served as financial advisor to Thoma Bravo and Kirkland & Ellis LLP served as legal advisor to Thoma Bravo. Financing for the transaction is being provided by Jefferies Finance LLC.

28. The Merger Consideration appears to be inadequate and undervalues the Company's shares and the misrepresentations and/or omissions in the Proxy conceal and/or mislead shareholders about the true fair value of their shares. Defendants claim the Merger Consideration represents a premium of approximately: (1) 21% to $81.92, the closing price of Ellie Mae common stock on February 11, 2019, the last full trading day prior to public announcement of Ellie Mae's entry into the Merger Agreement; (2) 35% to $73.50, the 30-day volume weighted average price of Ellie Mae common stock ending on February 11, 2019.  Proxy, Cover Letter. Defendants also claim a premium of 30% to $76.43, the unaffected closing price of Ellie Mae common stock on February 1, 2019, the last full trading day prior to market speculation about a potential transaction involving Ellie Mae, and approximately 42% to the one-month average closing price of $69.64, and approximately 49% to the three-month average closing price of $66.62, in each case, ending on February 1, 2019. Proxy, p. 39.  These representations are misleading.

29. The Company reported its Fourth Quarter and full year ended December 31, 2018, financial results on February 14, 2019, including revenues of $116.0 million up from $112.9 million from the same quarter the previous year. Full year revenue was $480.3 million vs. $417.0 million for 2017.

30. Since the announcement of the Proposed Transaction, Ellie Mae's stock has dropped to below the $99.00 per share Merger Consideration.

**The Materially Incomplete and Misleading Proxy**

31. On March 15, 2019, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Proxy

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

3:19-cv-01414

before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits both required and material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *The Materiality of Financial Projections*

32.    A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction. Here, the financial forecasts were relied on to approve the Merger Agreement and recommend the Proposed Transaction to shareholders. Proxy, p. 39.

33.    When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101). Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions. In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K. *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

34.    Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format." 17 C.F.R. § 229.10(b). Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items." *Id.*

35.    In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor*

8

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

3:19-cv-01414

*understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

(ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

*Id.* (emphasis added).

36.     Here, Ellie Mae's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that in negotiating the Merger Consideration and making its recommendation that shareholders vote in favor of the Proposed Transaction, the Board instructed management to construct a five-year financial plan that it deemed "were the most current and predictive forecasts of the future financial performance of Ellie Mae and approved the five-year financial plan (the 'Five-Year Projections')." Proxy, pp. 31, 48.

37.     Despite disclosing that the Five-Year Projections were the most predictive of Ellie Mae's future performance, the Board issued the Proxy with another set of projections called "Management Projections" and now in the Proxy claims the following:

The Management Projections were based on the Five-Year Projections that Ellie Mae management presented to the Board of Directors in January 2019 in connection with the Board of Directors' review of the proposed Merger, and updated to include certain financial forecasts for calendar years 2024-2028 and Unlevered Free Cash Flow for calendar years 2019-2028. A subset of the Five-Year Projections was made available to Parent and Merger Sub at Parent's request in connection with their due diligence review, and the Management Projections were made available to J.P. Morgan in connection with the rendering of J.P. Morgan's opinion to the Board of Directors.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

3:19-cv-01414

*Id.*, p. 48.[1]

38.    As discussed further below, the non-GAAP financial projections here do not provide Ellie Mae's shareholders with a materially complete understanding of the assumptions and key factors considered in developing the Forecasts, which assumptions, factors and other inputs the Board reviewed.

### *The Financial Projections are Materially Incomplete*

39.    The Proxy discloses non-GAAP financial Projections ". . . in order to provide Ellie Mae stockholders with access to information that was made available to, and approved by, the Board of Directors in connection with its evaluation of the Merger and the Per Share Merger Consideration." *Id.*

40.    Nevertheless, the Proxy fails to disclose certain material information regarding the Projections, rendering the Proxy materially false and/or misleading.

41.    More specifically, the Proxy discloses that the Projections were not prepared in compliance with GAAP and no reconciliation of the non-GAAP financial Projections with GAAP financial projections is provided under Regulation G (Proxy, p. 49) and self-servingly claims exemption from Regulation G solely because its financial advisor J.P. Morgan also relied on certain of the Projections in its methodology for the fairness opinion. This self-serving legal conclusion is wrong and conflicts directly with the language of Regulation G and the official SEC position on the application of Regulation G, as discussed below.

42.    The use of non-GAAP financial Projections without complying with Regulation G and otherwise disclosing the GAAP compliant financial metrics is misleading and the omission of GAAP compliant financial projections violates Section 14(a).

43.    The Proxy discloses projected "Adjusted EBITDA" and Unlevered Free Cash Flow ("UFCF"). Adjusted EBITDA is defined as "non-GAAP financial measure and is earnings before

---

[1]    Both sets of projections may collectively also be referred to as "Projections" unless otherwise distinguished.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

interest, tax, depreciation and amortization and excludes stock-based compensation expense."
UFCF is defined as "a non-GAAP financial measure and is calculated as Adjusted EBITDA (as
shown in the table above) less (i) stock-based compensation, less (ii) estimated cash tax expense,
less (iii) property and equipment capital expenditures, less (iv) internal-use software capital
expenditures, plus or minus (v) change in net working capital." Proxy, p 48, n.1-2.  The Proxy fails
to disclose the specific line items used to calculate these two non-GAAP financial projections or
provide a reconciliation of these non-GAAP measures to their respective most comparable GAAP
measures.  Proxy, p. 48.

44.    Thus, the Proxy's disclosure of these non-GAAP financial forecast provides an
incomplete and materially misleading understanding of the Company's future financial prospects
and the inputs and assumptions for which those prospects are based upon as it is clear that those
line items were in fact forecasted and utilized in calculating the non-GAAP measures disclosed
and relied on by the Board to recommend the Proposed Transaction, in violation of Section 14(a)
of the Exchange Act.

45.    The Projections disclosed on page 48 of the Proxy violate Section 14(a) of the
Exchange Act because:  (1) the use of such forecasted non-GAAP financial measures alone violates
SEC Regulation G as Defendants failed to reconcile those non-GAAP measures to their closest
GAAP equivalents or otherwise disclose the specific financial assumptions and inputs used to
calculate the non-GAAP measures; and (2) violates SEC Regulation 14a-9 because they are
materially misleading as shareholders are unable to discern the veracity of the financial
projections.  As such, this information must be disclosed in order to cure the materially misleading
disclosures regarding both the financial projections developed by the Company as well as the
projections relied upon by the Company's financial advisors.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

3:19-cv-01414

*The Financial Projections Violate Regulation G*

46.     The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[2] and adopted Regulation G[3] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[4]

47.     Defendants must comply with Regulation G. More specifically, the company must disclose the most directly comparable GAAP financial measure and a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[5]

48.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[6]  Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique, company-specific non-GAAP financial measures

---

[2]     Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure. 17 C.F.R. § 244.101(a)(1).

[3]     Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[4]     United States Securities and Exchange Commission, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (2002), *available at* https://www.sec.gov/rules/final/33-8176.htm (last visited Mar. 18, 2019) ("SEC, *Final Rule*").

[5]     *Id.*

[6]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/ (last visited Mar. 18, 2019); Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times (Apr. 22, 2016), *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0 (last visited Mar. 18, 2019).

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[7]

49.     The SEC has required compliance with Regulation G, including the reconciliation requirement in other merger transactions. *Compare Youku Tudou Inc., et al.*, Correspondence 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination)[8], with *Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.")[9]; *see Harbin Electric, Inc.*, Correspondence 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[10]

---

[7]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted) (last visited Mar. 18, 2019).

[8]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm (last visited Mar. 18, 2019).

[9]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf (last visited Mar. 18, 2019).

[10]     *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm (last visited Mar. 18, 2019). *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010), a*vailable at* https://www.sec.gov/Archives/edgar/data/907687

13

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

50.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).   Thus, in order to bring the Proxy into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9

51.     In addition to the Proxy's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures renders the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP measures and their respective most comparable GAAP financial measures.   Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading for the reasons discussed above.

52.     Defendants even admit that the non-GAAP Projections are misleading without the GAAP compliant projected financial metrics and therefore should be reviewed with GAAP compliant financial projections:

> These non-GAAP financial measures should not be viewed as a substitute for GAAP financial measures and may be different from non-GAAP financial measures used by other companies. Furthermore, there are limitations inherent in non-GAAP financial measures because they exclude charges and credits that are required to be included in a GAAP presentation. **Accordingly, these non-GAAP financial measures should be considered together with, and not as an alternative to, financial measures prepared in accordance with GAAP**.

/000000000010060087/filename1.pdf (last visited Mar. 18, 2019) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G.").   The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflects the SEC's official position. Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations, when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such at the Proposed Transaction, is incorrect. The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G. The SEC itself expressly disclaims C&DIs as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited Mar. 18, 2019).

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

3:19-cv-01414

Proxy, p. 49.

53.    And yet, after making the above admission and advising its shareholder to review the non-GAAP Projections with GAAP projections, Defendants refused to disclose the GAAP projections.

54.    Moreover, the Projections are clearly material since the Board considered the Company's projected financial condition in recommending shareholders vote in favor of the Proposed Transaction (as discussed above).  As such, shareholders would clearly want a complete and non-misleading understanding of those Forecasts.

55.    In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

56.    In sum, the Proxy independently violates: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial measure to its most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction.

57.    Absent disclosure of the foregoing material omitted information prior to the special shareholder meeting, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

58.    In the event the shareholder vote is not enjoined so that the materially misleading Proxy can be corrected, then Plaintiff and the other members of the Class seek damages.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act
and 17 C.F.R. § 244.100 Promulgated Thereunder)**

59.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

60.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

61.     As set forth above, the Proxy omits material information required by SEC Regulation G, 17 C.F.R. § 244.100, which therefore constitutes an independent violation of Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).

62.     The failure to reconcile the numerous material non-GAAP financial measures included in the Proxy is a violation of Regulation G and constitutes a violation of Section 14(a).

63.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

64.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

**COUNT II**

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder)**

65.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

66.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in Proxy communications that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

67.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).  The SEC's official public position is to enforce Regulation G in merger transactions by compelling target companies to amend solicitation material, including proxies, to comply with Regulation G.

68.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

69.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or

17

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

70.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

71.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

72.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a Proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

73.     Ellie Mae is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

74.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

75.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

18

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**COUNT III**

**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

76.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

77.     The Individual Defendants acted as controlling persons of Ellie Mae within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Ellie Mae, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

78.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

79.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing the Proxy.

80.     In addition, as described herein and set forth at length in the Proxy, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants

19

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

81.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

82.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

83.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and her counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.    Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.    Granting such other and further relief as this Court may deem just and proper.

20

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1

## JURY DEMAND

2      Plaintiff demands a trial by jury on all issues so triable.

3  Dated:  March 18, 2019

4                                            Respectfully submitted,

5                                            **FARUQI & FARUQI, LLP**

6  **OF COUNSEL:**                           By: _/s/ Benjamin Heikali_
                                             Benjamin Heikali, Bar No. 307466
7  **FARUQI & FARUQI, LLP**                  10866 Wilshire Blvd., Suite 1470
                                             Los Angeles, CA 90024
8  Nadeem Faruqi                             Tel.: (424) 256-2884
9  James M. Wilson, Jr.                      Fax: 424.256.2885
   685 Third Ave., 26th Fl.                  Email: bheikali@faruqilaw.com
10 New York, NY 10017
   Telephone: (212) 983-9330                 *Counsel for Plaintiff*
11 Email: nfaruqi@faruqilaw.com
   Email: jwilson@faruqilaw.com
12
13 *Counsel for Plaintiff*

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                    21